Filed 2/3/26  In re A.B. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| In re A.B., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, Plaintiff and Respondent, v. T.V., Defendant and Appellant. | E086687 (Super.Ct.No. DPIN2200090) OPINION |

APPEAL from the Superior Court of Riverside County.  Susanne S. Cho, Judge.

Affirmed in part; conditionally reversed in part with directions.

Timothy O'Crowley, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Jamila T. Purnell, Chief Assistant County Counsel, and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and Appellant Tameka V. (mother) appeals from orders of the Riverside County juvenile court denying her petition to reinstate family reunification services (Welf. & Inst. Code, § 388)[1] and terminating her parental rights (§ 366.26) as to one of her three children, A.B. (the child). The child's alleged father died in 2021, when the child was four or five years old.

We will affirm the denial of the 388 petition and conditionally reverse the order terminating parental rights for compliance with section 224.2 and California Rules of Court, rule 5.481,[2] California's provisions designed to implement and enhance the federal Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.).

**BACKGROUND**

On October 24, 2022, when the child was six years old, officers from the Riverside County Sheriff's Department picked up the child and his 15-year-old half-brother, L.J., after mother had contacted law enforcement in the wee hours of the morning to report that L.J. had taken the child from home the day before and were staying in a motel.

A social worker at the Riverside County Department of Public Social Services (the Department) took the children into protective custody, and transported them to the Department's welcome center, in Beaumont, California. L.J. told the social worker that he, the child, their 18-year-old half-sister J.V., and their mother lived with the maternal grandmother until the maternal grandmother's death (in December 2021). L.J. said

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise designated.

[2] References to the rules are to the California Rules of Court.

mother had not been taking care of them well and he decided to go to a hotel and took the child with him. It was not the first time that L.J. had left home with the child because he did not feel mother was taking proper care of the child. When the social worker tried to interview the child, L.J. told the child not to answer any questions. Later that day, the children ran out of the welcome center and the staff lost sight of them as they ran through a park across the street.

On October 26, 2022, the Department filed a juvenile dependency petition alleging the children came within section 300.

I. *Detention*

The whereabouts of mother, the child, and L.J. remained unknown at the time of the October 27, 2022, detention hearing. The juvenile court appointed counsel for the missing parties, ordered a parent locator for mother, and issued "AWOL" (absent without leave) warrants for the children with an order that they be detained and placed in the Department's care once found. It granted the request of children's counsel that the child and L.J. be placed separately when found because the child does whatever L.J. tells him to do, which compromises the child's safety.

II. *Jurisdiction and Disposition*

At the detention hearing, the juvenile court set a jurisdictional hearing for December 8, 2022, but on that date the whereabouts of the children remained unknown, so the court ordered the Department to put the matter back on calendar when they were located.

3

In February 2023, law enforcement personnel responded to a complaint of trespassing and squatting, and found mother, half-sister J.V., and the child living in a private property that had no running water or electricity, and had an excessive amount of garbage both inside and outside.  The Department took the child into custody and placed him in a foster home.

In a report prepared in anticipation of the combined hearings on jurisdiction and disposition set for March 13, 2023, the social worker noted that the child was adjusting well in his placement and played well with the other children in the home.  The foster parents expressed concerns with the child's ability to retain information and, although there was no mention of behavioral issues while the child was awake, the foster parents said he walked in his sleep, had night terrors, and would wake up screaming and banging on the walls.  The child had no recollection of the dreams or those behaviors when he was awake.

The child had a visit with his mother and half-siblings J.V. and L.J. before the jurisdiction/disposition hearings.  Mother, who had been advised not to discuss anything related to the case or placement and not to make any promises, repeatedly told the child that L.J. would be leaving with the child to the child's placement that night.  The visit ended traumatically for the child, who started screaming and sobbing when leaving the visit and remained distressed for the duration of the trip back to his placement.

By the time of the March 13, 2023, combined hearings on jurisdiction and disposition, mother had been arrested a second time and was incarcerated.  The juvenile

court sustained an amended version of the juvenile dependency petition, which included allegations that mother neglected the child, the child had left home with L.J. because they could not find mother and she was not feeding the child, mother had a history of abusing methamphetamine and cocaine, she had appeared under the influence when she was found with the child in February 2023, and she was incarcerated and was not able to provide for the continuous care and support of the child.

The child was adjudged a dependent of the court and removed from mother. The court ordered family reunification services, including therapeutic services for the child, individual counseling and parenting classes for mother and establishing the ability to provide for the child and to secure safe and secure housing. The court ordered supervised two-hour visits between the child and his half-siblings once each week and supervised two-hour visits with mother every two weeks when she was no longer incarcerated. The Department was authorized to increase visits if they were going well.

III. *The September 2023 Six-Month Review Hearing*

In August 2023 the Department prepared a status report in anticipation of the September 13, 2023, six-month review hearing. Mother, who had a lengthy history of convictions for various offenses, had been incarcerated between April and July 2023. She characterized her criminal charges as misunderstandings and being in the wrong place at the wrong time.

Once released from jail in July 2023 mother enrolled in psychiatric services but had not yet attended an appointment and the Department was unable to verify that that

she had signed up. Mother said she had (i) completed a quick online parenting class but was not sure it would be court approved and she needed $175 to print the certificate, and (ii) that she had enrolled in a substance abuse program but did not provide verification of enrollment or progress and refused to drug test because she did not think she had a drug problem. She had found temporary housing through the Housing and Urban Development Department but had not completed the paperwork necessary for obtaining permanent housing. Mother faulted the housing counselor's failure to advocate for her and for requesting too many documents on short notice for the delay in getting a permanent living space.

Mother's visits were initially set to take place every two weeks but by the time of status review report, she was allowed to participate in supervised weekly visits with the child, J.V., and L.J. and those visits went well. By the time of the August 2023 status report, she had failed to show up or cancel two of the five visits she was offered after she got out of jail and, by the time of the September 2023 hearing, the child's counsel noted that she had missed the last several visits and that the child had started having tantrums after visits.

The court ordered mother's visits to return to every two weeks, found that the Department had provided reasonable services and ordered services to be continued, and set the matter for a 12-month review in December 2023.

IV. *The January 2024 Contested 12-Month Review Hearing*

By the time of the Department's December 2023 report for the 12-month review hearing, mother had not yet secured permanent housing or a stable income, she refused to participate in drug testing and had not completed services other than attending psychiatry appointments. Mother continued to visit with the child and L.J. albeit inconsistently, and she "remaine[d] appropriate" during visits. The Department recommended termination of family reunification services and reduction in mother's visits with the child. Mother set the matter for a contested hearing.

While the contested hearing was pending, mother said she continued to use controlled substances and provided the Department with a copy of certificate evidencing completion of a six-hour parenting class on December 16, 2023. The program development team advised that mother was not compliant with the bringing families home program.

Mother did not appear at the January 10, 2024, contested hearing and her counsel, who represented that he had tried to contact his client several times, objected to termination of services. The child's caretaker appeared and advised the court that the child's behavior was becoming so increasingly unbearable after visits with mother that the caretaker no longer wanted to adopt the child or to become his guardian. The caretaker said the child's behaviors had evened out since not seeing mother during the most recent four or five visits with the siblings but also expressed concern that L.J. had made more than one threat to kidnap the child.

The juvenile court terminated mother's family reunification services and decreased her supervised visits to two hours once a month but, because the caretaker was not at that time committed caring for the child permanently, the court did not set a section 366.26 permanent plan selection hearing but set the case for a section 366.3 postpermanency status review hearing. Mother did not appeal.

V. *The Postpermanency Status Review Hearings*

The court held postpermanency status review hearings in the 20-month period elapsing between the termination of reunification services and the selection of a permanent plan.

In anticipation of the June 2024 status review hearing, the Department reported that the child continued to have bi-monthly visits with his siblings, which he looked forward to. Mother had not attended a visit with the child during the reporting period (January-June) although she did have two short FaceTime conversations with the child and L.J. during sibling visits. The child was still living with the same foster family, who wished to continue caring for him but did not want to provide him with a permanent home.

In December 2024, the Department advised the juvenile court that the child had been placed with a matched prospective adoptive family on October 25, 2024. He had adjusted well to his new surroundings, he was eating and sleeping well, had made friends in his new school, and said he feels safe and comfortable with his new caretakers. No behavioral concerns were reported at home or at school, and the child was actively

8

participating in therapy and developing coping skills, and was receptive to conversations with the therapist surrounding adoption.

Mother had not maintained consistent contact with the Department and had not visited the child in over a year. A November 2024 visit had been arranged for her, but she ended up being arrested in October and charged with burglary and grand theft. At the time of the Department's report, mother was being held at the Robert Presley Detention Center and was scheduled for a drug court evaluation for December 19, 2024. While incarcerated, mother wrote a letter to the Department asking for visits and the Department reported that, if the child wished to see mother, it would arrange for monthly in person jail visits for him.

Mother was present with counsel at the January 2025 review hearing. The juvenile court authorized mother to have telephone visits with the child and monthly two-hour in-person visits with authorization for those visits to be increased. The matter was set for a section 366.26 permanent plan selection hearing on July 8, 2025, and the court advised the parties that preservation of any right to appellate review of the court's order required them to seek an extraordinary writ. Mother did not file a notice of intent to file a writ petition.

VI. *Mother's Section 388 Petition and the Permanent Plan Selection Hearing*

In April 2025, the Department filed a permanent plan report. It described the child's prospective adoptive family, noted that they were willing and able to adopt the child, that a close attachment had developed between the child and the family. The child

was too young to fully understand the concept of adoption, but he was clearly well-bonded with the potential adoptive parents and said he wanted to stay in their home and be cared for by them.

On May 7, 2025, the day before the permanent plan selection hearing was set to begin, mother filed a section 388 petition requesting an order reinstating family reunification services on the grounds that she had worked very hard to achieve stability and sobriety, and because the child and L.J. are very bonded to her and they wanted the family to be reunified.

A hearing on the petition was ordered for the next day but, because it had not been placed on the calendar, the juvenile court found good cause to continue the permanent plan hearing and put it and the petition on calendar for July 8, 2025. On July 8, mother requested a continuance to permit time for preparation of a study to see how bonded mother was with the child. The court indicated it would not find good cause to continue the matter for the study because it did not think it was critical but noted mother would have time to arrange for one because it was setting the section 388 petition for a contested hearing on August 12, 2025, and trailing the hearing on the permanent plan for the same date.[3]

In the course of presenting her arguments at the August 12, 2025 hearing, mother requested a continuance because a bonding study scheduled for August 1 had not taken

---

[3] At the July 8, 2025 hearing, the court ordered the juvenile clerk's office to create a non-minor dependent case for L.J., who would be turning 18 years old on July 22, 2025.

place. The court did not explicitly rule on the request but proceeded with the hearing. It denied mother's section 388 petition and, upon finding by clear and convincing evidence that the child was adoptable and likely to be adopted, it terminated mother's parental rights.

**DISCUSSION**

On appeal, mother argues that reversal of the order terminating her parental rights is called for because the juvenile court abused its discretion (i) when it denied her request to continue the section 366.26 hearing to permit rescheduling of a bonding study, and (ii) when it denied her section 388 petition to reinstate family reunification services. Mother also posits that the termination order should be conditionally reversed because the Department did not adequately comply with the Indian child inquiry provisions set forth in section 224.2 and rule 5.481.

A. *The Denial of a Continuance To Permit Rescheduling of a Bonding Study*

At the August 12, 2025, section 366.26 hearing, mother orally requested a continuance, advising the court that a bonding study for mother and the child, which was "basically scheduled" for August 1, had been cancelled at the last minute because the child did not want to attend. Mother argues that the juvenile court abused its discretion when it failed to continue the permanent plan selection hearing to permit rescheduling of that study. We do not agree.

As relevant here, section 352 authorizes the juvenile court to continue a juvenile dependency hearing upon a showing of good cause so long as the continuance is not

11

contrary to the minor's interest.  (§ 352, subd. (a)(1) & (2); *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 632 (*Michael G.*).)  In considering the minor's interests, the court is required to give substantial weight to the minor's need for prompt resolution of his or her custody status, to the need to provide children with stable environments, and to the damage to a minor of prolonged temporary placements.  (§ 352, subd. (a)(1); *Michael G.*, *supra,* at p. 632.)

A party seeking a continuance is required to file and serve on the parties a written notice of motion for the continuance at least two days prior to the date set for hearing, together with affidavits or declarations detailing specific facts showing that a continuance is necessary although the court may for good cause entertain an oral motion.  (§ 352, subd. (a)(3); rule 5.550(a)(4).)

The juvenile court's denial of a continuance request is reviewed for an abuse of discretion, and we will not disturb the lower court's ruling unless it is arbitrary, capricious or patently absurd and results in a manifest miscarriage of justice.  (*In re D.N.* (2020) 56 Cal.App.5th 741, 756.)

Here, we do not find that the court abused its discretion when it proceeded with the permanent plan selection hearing without continuing it a third time.  Mother did not file a written motion to continue the hearing set for August 12, 2025, as required by section 352, subdivision (a)(3), and made no mention in the juvenile court of her lack of compliance with the requirement.  And, although the juvenile court did not make an explicit ruling on mother's oral request to continue the hearing, it did observe in

connection with its decision not to reinstate family reunification services that the child understood termination of parental rights meant there would be no more visits and he was "okay with that" because he doesn't want visitation, and the court opined that dragging out the proceedings would "just traumatize[] him further."

Mother did not offer the trial court, nor mention in her briefs filed in this court, any explanation why she did not comply with the requirement that she file a written motion at least two days before the hearing. On appeal, she argues that the last-minute cancellation of the bonding study arranged by her counsel constituted good cause for a continuance because, without the study, she did not have the evidence she "needed to demonstrate that despite limited visitation, [the child's] bond to his mother was substantial." She posits the evidence was relevant both to the establishment of the best interest component of her section 388 petition and the establishment of the "beneficial relationship exception."[4] We are not persuaded.

Mother's claims presuppose that the bonding study would necessarily have concluded that the child was very bonded to her. She asserts that the study was necessary (and suggests the result would reflect positively on the child's relationship with her)

---

[4] Mother's mention of the "beneficial relationship exception" is likely a reference to section 366.26, subd. (c)(1)(B)(i), which authorizes the juvenile court to select a permanent plan other than adoption if the parent has established three elements by a preponderance of evidence: (i) the parent maintained regular visitation and contact with the child; (ii) the child has, and would benefit from continuing, a substantial, positive, emotional attachment to the parent; and (iii) termination of that relationship would be detrimental to the child even when balanced against the benefits of an adoptive home. (*In re Caden C.* (2021) 11 Cal.5th 614, 636–637.) Mother did not raise the exception at the permanent plan selection hearing.

because she cared for the child for six years prior to the commencement of the juvenile dependency proceedings, that throughout the case the child always wanted to visit her and he was sad when she missed visits, and, though the child was upset when mother did not visit, he also had "anger acting out issues unrelated to his relationship with his mother." The record does not support those assertions.

It appears from the record that, until she died in December 2021, the maternal grandmother provided the primary care of the child and that mother was a transient with who had suffered several convictions for various offenses between 2015 and 2022. For example, when the child was born, L.J. (then eight years old) and J.V. (then 12 years old) lived with the maternal grandmother, who was their guardian. Mother moved in with the family a month before giving birth to the child. When the child was two years old, the maternal grandmother left the hospital against medical advice following hip replacement surgery because she had to go home to care for the children. And, after the grandmother's death in December 2021, it appears L.J. became the child's primary caretaker because mother was not caring for the child properly.

Nor does the record support mother's assertion that the child "always wanted to visit" her. Rather, it shows that the child "inquired" as to visits with his mother and half-sister J.V. shortly after being taken into custody but the child's main concern was staying close to L.J. as well as seeing J.V. In July 2025, shortly before the permanent plan selection hearing, the child said he did not always want to visit mother, that he still felt hurt about her never being there for him, and he was fine not having visits alone with her,

14

he did not like that mother told him that he had to go to the bonding study appointment, and he refused to attend even when the social worker offered to stay with him for the entire study.

Mother's assertion that the child's behavioral issues were unrelated to his relationship with her is also not supported by the record. The foster parent who took care of the child from February 2023 until the child was placed with an adoptive family in October 2024, noted that the child's anger outbursts were triggered by visits with mother and that his behaviors evened out after mother failed to attend four or five visits in a row.

B. *The Denial of Mother's Section 388 Petition*

Mother argues that reversal of the order terminating her parental rights is called for because the juvenile court abused its discretion when it denied her section 388 petition seeking reinstatement of family reunification services because the petition was supported by facts in the record. She also claims the court improperly considered extraneous evidence when making its decision to deny the petition.

Subdivision (a)(1) of section 388 provides in relevant part that a parent of a child who is a dependent of the juvenile court may, upon grounds of a change of circumstances or new evidence, petition the court to modify or set aside a previous order made by that court. (*In re R.M.* (2025) 111 Cal.App.5th 119, 136 (*R.M.*).)

To obtain relief under section 388, the parent must establish two elements by a preponderance of the evidence: (i) there has been a change in circumstances or new evidence, and (ii) that the proposed change of order would be in the best interests of the

15

child.  (*In re A.A.* (2012) 203 Cal.App.4th 597, 611–612 (*A.A.*).)  Generally speaking, the parent must show by a preponderance of the evidence that the child's welfare requires the modification the parent is seeking.  (*Id.*, at p. 612.)  The change in circumstances must be substantial.  (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)  In making its decision, the court may consider the entire factual and procedural history of the case.  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

And, in cases like the present one in which a section 388 petition is filed after family reunification services have been terminated, the focus of the dependency proceedings is no longer the parent's interest in maintaining a relationship with the child but rather the child's interest in permanency and stability, a consideration the juvenile court must recognize when considering a postservices petition.  (*In re J.C.* (2014) 226 Cal.App.4th 503, 526–527 (*J.C.*).)

The petition is addressed to the discretion of the juvenile court, and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *A.A.*, *supra*, 203 Cal.App.4th at p. 612.)

(i) *Mother's change of circumstances*

Mother argues that the juvenile court erred when it found her circumstances had not changed because after reunification services were terminated in January 2024 she had addressed and changed "all the risk factors stated in the section 300 petition."

After mother was released on bail on December 30, 2024, following her October 2024 arrest on charges of felony burglary and grand theft, she undertook to address the

16

issues and change the circumstances that led to the child becoming a dependent of the juvenile court. The attachments to mother's May 7, 2025 petition and the social worker's interviews with mother in June 2025 established that, beginning in January 2025, mother enrolled in an intensive outpatient program to address her substance abuse issues, she started attending appointments with a psychiatrist and receiving therapy and counseling, took parenting classes, obtained housing through the Family Self Sufficiency Program effective March 1, 2025, was involved in several support groups including AA and NA, and though not employed, she planned to apply for an online truck driving school.

Mother's substance abuse counselor confirmed that mother was consistently participating in her program and, although mother was still "fresh" in her recovery, the counselor believed there was a possibility of mother achieving long term sobriety.

At the hearing on the petition, the juvenile court recognized mother had recently made efforts and had "kind of turned things around" after she posted bail in December 2024 but made clear that her progress since January reflected changing, not changed, circumstances. The court also noted that the felony charges against mother were still pending and she had a strike prior that was kind of recent, so her future and stability were at risk.

While we commend mother's efforts undertaken after her release from jail at the end of December 2024, we do not find the juvenile court abused its discretion in finding that her circumstances were changing but had not changed sufficiently to meet her burden as to the first element of section 388.

17

(ii) *The child's best interests*

The juvenile court also found mother had not met her burden to establish that the child's best interests would be served by providing mother with further family reunification services well over a year after they had been terminated.  It noted that the child was nine years old, his case had been open for three years, mother had a pending criminal case which put her future and stability at risk, and it would not be in the child's best interest "to reopen the case again and go back to square one."

Mother argues that the juvenile court erred when it found it was not in the child's best interests to resume family reunification services well over a year after they had been terminated because she had established that she had ameliorated the issues leading to the child's removal, the child had an unquestionably strong bond with L.J. and J.V., and because he was bonded to mother.  Mother's arguments are unavailing.

As discussed *ante*, mother had made commendable efforts to address her issues with drugs, unemployment, and housing in the seven or so months immediately before the hearing on her section 388 petition.  But providing additional time and services to her with the hope she would not only achieve success in her drug program but also manage to avoid a prison sentence with respect to her felony criminal charges is antithetical to promoting the child's interest in permanency and stability.  (*J.C.*, *supra*, 226 Cal.App.4th at p. 527.)

We are unaware of any authority to support the proposition that the existence of a bond between the child and his adult half-siblings support a parent's section 388 seeking resumption of family reunification services, and mother does not cite any.

With respect to mother's claims that she shares a bond with the child, she repeats her assertions that she was the child's caretaker for six years prior to the dependency proceedings, that the child always wanted to visit her, he was sad and upset when she did not visit but had anger acting out issues unrelated to his relationship with mother. We have already addressed those assertions *ante,* and found they were not supported by the record.

What the record does reflect is that the child had bonded and developed a positive relationship with his new family, he wanted to stay in their home and be cared for by them, he was stable and excelling in the family's care, and the family was committed to adopting him.

Considering the lack of evidence of a strong mother-child bond and the evidence demonstrating the child's bond and positive relationship with his intended adoptive parents against the backdrop of the child's paramount need for permanence and stability, we find the juvenile court properly exercised its discretion when it found the child's best interests would not be served by granting mother's section 388 petition.

(iii) *Mother's Claim that the Juvenile Court Considered Extraneous Evidence*

Mother claims her due process rights were denied when the juvenile court considered extraneous evidence.

In support of her claim, she points to the following remarks the court made in the context of describing the difficulties mother had been experiencing before she started changing her circumstances, her pending criminal charges placed her future and stability at risk:

"After the termination of services on January 10, 2024, you unfortunately still were struggling out there, engaged in substance abuse, and homelessness, and criminal behavior, which caused you to be accused in this courthouse in a felony case pending at this time. The incident date was March of last year.

"Now, I don't know if the gentleman who was in the police report is the same partner you have today. But I'm concerned that you have a pending a criminal case where your future and stability are still at risk. We don't know what's going to happen yet on that case. Because of the strike prior you have, I don't know if you are going to be able to get a judge to strike the strike so that you can try to get probation. Because your strike is kind of recent, and it's not that easy to get a judge to do that.

"Now, what you've done in the last few months makes a pretty strong case for a judge to be able to do that, even though it's a recent strike. But it really doesn't provide me with a lot of comfort in terms of proving up the first element of this motion today."

Based on the court's mention of a police report and the fact that a police report was not entered into evidence, mother claims the court improperly "relied" on information that had not been admitted into evidence but she does not say what the court relied on it for.

Mother forfeited her claim because she did not object to the court's mention of a police report. (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114 [it is a well-established procedural principle that an appellate court will not consider claims of error that could have been raised in the trial court but were not].) In all events, mother does not explain—and we cannot fathom—how mother was prejudiced by the reference.

C. *Compliance with California's ICWA Inquiry Provisions*

Mother argues that that the juvenile court did not exact the Department's full compliance with the ICWA inquiry requirements set forth in section 224.2 and rule 5.481. We agree.

(i) *The Statutory Framework*

ICWA was enacted by Congress to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families in child custody proceedings, including juvenile dependency cases. (25 U.S.C. §§ 1902, 1903(1); 25 C.F.R. § 23.106 (2025).) To that end, California law imposes an affirmative and continuing duty on the court and child services agencies such as the Department to conduct ICWA inquiries to determine whether a child for whom a section 300 juvenile dependency petition has or may be filed is or may be an Indian child, and to provide information to tribes when there is a reason to believe or a reason to know the child is or may be an Indian child. (§ 224.2, subd. (a); rule 5.481(a); *In re Dezi C.* (2024) 16 Cal.5th 1112, 1131–1133 (*Dezi C.*).)

California's provisions governing the timing and scope of the Department's duties of ICWA inquiry and notice (sometimes collectively referred to herein as Cal-ICWA) are set forth in sections 224.2, 224.3, and rule 5.481.  Section 224.2 provides in relevant part that, if the Department takes a child into protective custody, it is required to ask the child, the parents, extended family members, and others who have an interest in the child whether the child is or may be an Indian child and where the child and parents are domiciled.  (§ 224.2, subd. (b)(1), formerly subd. (a), renumbered and revised without substantive change, Stats. 2024, ch. 656, § 3, eff. Sept. 27, 2024.)  Rule 5.481(a)(5) requires the Department to include in its filings on an ongoing basis a detailed description of all inquiries undertaken.

(ii) *The Standard of Review*

When the juvenile court has a well-developed record, it is afforded relatively broad discretion in making the fact-specific determination that the child services agency complied with the Cal-ICWA requirements.  (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141.)  We will uphold the court's finding that ICWA does not apply so long as the court's conclusions are supported by sufficient evidence and documentation in the record as required by California law.  (*Ibid.*)

If, however, a record is not well developed because inquiry was not properly undertaken and reported as required, then the juvenile court's discretion necessarily becomes more limited.  (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1141, 1151.)  In those cases, conditional reversal is required because, until the Department gathers, shares, and

22

documents the information required by Cal-ICWA, it is not possible to know what information a properly conducted inquiry might reveal. (*Id.*, at pp. 1136, 1152.)

(iii) *The ICWA Inquiry Was Inadequate*

Here, there is no mention in the record of any effort to determine if the child's deceased father may have had Native American ancestry. The Department posits that ICWA's definition of a parent "does not include an unwed father where paternity has not been acknowledged or established," and, therefore, ICWA does not apply in this case because father's name does not appear on the child's birth certificate and, because no one asked the trial court to make paternity findings, none were made. We disagree.

On August 29, 2023, the mother confirmed father's paternity as to the child. But there is no indication in the record that the Department asked mother, J.V., L.J., the child, or any other readily available family member or interested person whether they had any information about father's ancestry or if they had contact information for any extended family member or interested person who might have knowledge of father's ancestry. The record reflects only that J.V. denied any Native American ancestry on the maternal side of the family, that mother denied that she had any Native American ancestry, and that, when the child was seven years old, he denied having Native American ancestry. Accordingly, conditional reversal of the order terminating parental rights is called for because the juvenile court's findings that ICWA did not apply to the proceedings were made without an adequate inquiry having been made.

**DISPOSITION**

The juvenile court's order denying mother's section 388 petition is affirmed.

The juvenile court's order terminating parental rights is conditionally reversed. On remand, the court is instructed to order the Department (i) to comply with its duty of inquiry by interviewing readily available family members, including extended family members, and others who have an interest in the child who may have potentially meaningful information about the child's paternal ancestors; (ii) to provide the information obtained to the pertinent tribes; and (iii) to provide the juvenile court with a detailed description of all inquiries undertaken, and all information received pertaining to the child's Indian status.

If the juvenile court determines that ICWA does not apply, then the court shall reinstate the orders. If the court determines that ICWA does apply, then it shall proceed in conformity with ICWA and related California law.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

FIELDS
J.

24